**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLYSON B, a minor by and through her parents, SUSAN B. and MARK B.,<br>　　　　　Plaintiffs,<br><br>　　　　v.<br><br>MONTGOMERY COUNTY INTERMEDIATE UNIT NO. 23,<br>　　　　　Defendant. | Civil Action No. 07-2798 |

**OPINION**

March 31, 2010                                                                                      Pollak, J.

　　　　This case arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*, § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 1983. It now come before me on cross motions for summary judgment/motions for judgment on the administrative record. Defendant filed a motion for summary judgment/judgment on the administrative record (Docket No. 44), to which plaintiffs filed a cross-motion for summary judgment/judgment on the administrative record (Docket No. 50) and a response to defendant's motion (Docket No. 51). Plaintiffs filed a motion to amend their cross-motion for summary judgment/judgment on the administrative record

(Docket No. 53).[1]  Defendants filed a response to plaintiffs' cross-motion (Docket No.

55).  Plaintiffs replied to the defendants' response (Docket No. 56).[2]  The cross motions

are now ripe for disposition.

## I.      Facts and Procedural History

### A.      Facts

Allyson B., child of Mark B. and Susan B., was born with profound binaural

hearing loss.  Decision of Special Education Hearing Officer (Decision), at 2.  In October

2003, when Allyson was six-months-old, the county mental health and mental retardation

(MH/MR) agency began to provide early intervention educational services twice a week.

Ibid.  The MH/MR agency paid for personnel of the Clarke Pennsylvania School, a

private school which specializes in deaf and hearing-impaired education, to provide these

in-home services.  *Ibid.*  These services were provided by Sherri Finkenscher and Jeana

Novak from Clarke for one hour, twice a week.  Hearing Transcript (HT), at 985-986

(Testimony of Susan B.)  On April 19, 2005, Allyson received a cochlear implant at the

Children's Hospital of Pennsylvania.  Decision, at 3.  In the summer of 2005, Allyson

began attending a toddler program at the Clarke School twice a week in the mornings, at

the parents' expense.  *Ibid.*  In March of 2006, the MH/MR agency reduced the in-home

---

[1] As the amended motion is not materially different from the original motion, leave to amend is granted and the amended motion was considered.

[2] The plaintiffs failed to request permission to file the reply brief as required by Local Rule 7.1(c).  I will overlook this failure and consider the reply, but counsel should be aware of the local rule and its importance.

services to once per week, in part, because Allyson's speech and language skills had improved and, in part, because she was attending the toddler group for six hours per week. *Ibid.*

On March 23, 2006, Sherri Finkenscher created an Early Intervention Progress Report/Annual Review evaluating Allyson's progress. Parents' Exh. 27, pg 246. Finkenscher conducted a Brigance Diagnostic of Early Development, which indicated that from July of 2005 to March of 2006 Allyson had made a great deal of progress. Parents' Exh. 27, pg 247. The Diagnostic of July 2005 found that in the areas of gross motor skills, fine motor skills, self-help skills, and social/emotional development Allyson had the skills of a child of age 2 years 0 months, and that her speech/language skills were that of a child of 1 year 0 months, while her actual chronological age at the time was 2 years 2 months. *Ibid.* The March 2006 Diagnostic showed that Allyson, then 2 years 10 months old, had developed the skills of a child between 3 years and 3 years 6 months old for the various skills tested, well above her chronological age, with the exception of her speech/language skills which were at the level of a 2 years 0 months-old child. *Ibid.*

The same report contained the results of the Hawaii Early Learning Profile (HELP), which provides age ranges for when certain skills are expected to develop in a child with normal hearing. *Ibid.* The results indicated that Allyson "falls solidly in the 24 month range with some younger skills lacking . . . and some older skills mastered." *Ibid.*

On March 31, 2006, employees of the Montgomery County Intermediate Unit

(MCIU), which was preparing to provide Allyson services once she reached age three, prepared an Evaluation Report along with Finckensher and Novak in anticipation of Allyson's transition to preschool. Parents' Ex. 27, pg 254. The report found that Allyson was able to identify words that differed by large sound difference, and, using a closed set of 12 familiar objects, Allyson could follow two key-word directions and simple one-step directions. Parents' Ex. 27, pg 259. In addition, the report indicated she knew around 100 words, frequently put two words together, and sometimes used three word utterances. *Ibid.* However, she inconsistently "maintained precision of known sounds" and had substitutions and omissions in words. *Ibid.* According to Jeana Novak, Allyson was able to communicate her wants and needs and used "intelligible speech." *Ibid.*

On May 3, 2006, Susan B. and Mark B., Sherri Finkensher, Jeana Novak, and Judith Sexton from Clarke, and Dr. Joan Evans and Gerry Delmonico from the MCIU, met to create an Individualized Education Program (IEP) for the next year which would cover Allyson's transition to preschool. Parents' Ex. 15. The major difference of opinion between the participants of this meeting was whether Allyson would attend the MCIU's new auditory oral classroom for the hearing-impaired or whether the MCIU would pay for her to attend Clarke's preschool program. HT 279-82 (Testimony of Joan Evans). Auditory oral programs attempt to maximize auditory perception and verbal expression by reducing dependence on tactile or visual cues, such as the use of sign language, so that students can develop the same method of communication as their typical hearing peers.

Decision, at 2.

Joan Evans, director of the new classroom recommended placement with the MCIU. NT 272-73, 440 (Testimony of Joan Evans), while Finkersher, the Clarke employee who provided Allyson in-home services, and Allyson's parents wanted her to attend Clarke. NT 272, 279-82 (Testimony of Joan Evans). According to Susan B., the MCIU staff present at the meeting made clear that the MCIU class was the only option. HT 1002 (Testimony of Susan B.).

On May 19, 2006, a Speech and Language Evaluation was conducted at the Children's Hospital of Pennsylvania (CHOP). Decision 4; Parents' Ex. 27, pgs 329-31. It showed Allyson to rank in the 23rd percentile in auditory comprehension and the 18th percentile for expressive comprehension and total language skills. Parents' Ex. 27, pg 330. However, it also said that she demonstrated "fair to good intelligibility during simple word productions" and her "speech productions skills [were] close to age-appropriate." Parents Ex. 27, pg 229, 230.

On June 13, 2006, Susan B. visited the facility where the MCIU planned to hold their new class. Decision, at 4. At this time, the IEP was revised to include 30 minutes of speech and language therapy weekly as well as payment of one week of tuition at Clarke to assist Allyson's transition to the MCIU preschool classroom. Decision, at 4, Parents Ex. 18, pg 152. Susan B. never received notice of the second IEP meeting, which was to occur when Susan B. was planning to visit the proposed classroom. HT 1032-33. Due to

the lack of notice, only Susan B. and Jeana Novak were present on behalf of the parents. Parents' Ex. 18. The MCIU employees present were Joan Evans, Gerry Delmonico, and Kimberly Buck, the teacher of the MCIU classroom, who was not present at the first IEP meeting. Parents' Ex. 18. On June 16, 2003, Susan and Mark B. rejected the proposed IEP. Decision, at 4. On July 7, 2006, they requested a due process hearing. *Ibid.*

In September of 2006, Janice Egan, the communications coordinator of Clarke, evaluated Allyson and found that her "[s]peech intelligibility i[s] compromised by nasality, substitutions/deletions of phonemes and limited linguistic competency." Parents' Ex. 25, pg 200. She recommended that Allyson receive daily speech therapy. *Ibid.* This contrasts with the evaluations by CHOP. Decision, at 7.

Before the opening of the MCIU classroom, the MCIU paid for hearing-impaired students to attend the Clarke School for preschool. Decision, at 6. It also allowed seven students who had been enrolled in the Clarke preschool as an MCIU placement, to continue to be placed at Clarke with MCIU funds. *Ibid.* This policy did not include allowing Allyson, who had been in Clarke's toddler program paid for with private funds to continue at Clarke using public funding. *Ibid*; HT 298-99 (Testimony of Joan Evans).

The proposed MCIU classroom opened on July 10, 2006. Decision, at 4. If Allyson had attended the classroom she would have been the only one with a cochlear implant, as the five students for that year only had hearing aids, with one of them in the process of receiving an implant. Decision, at 4.

The MCIU classroom planned to and does use a room at the YMCA in Montgomery County. Decision, at 4. The MCIU's educational audiologist was able to test the background noise of the classroom, the results of which were included in the information for potential parents. MCIU 18-7, HT 404-06 (Testimony of Joan Evans). He found ambient noise to be less than 35 decibels, which comports with professional standards. *Ibid.* A professional evaluation conducted in October of 2006 found the same, and further found that reverberation, the amount of time it takes sound to decay, was also consistent with professional standards. MCIU Ex. 17-2.

Kimberly Buck, the MCIU's teacher, has a master's degree in deaf education from Gallaudet University. Decision, at 5. She is a state-certified teacher of the hearing-impaired. Decision, at 5; MCIU Ex. 21-10. For the three years prior to opening the MCIU classroom, Buck was a hearing support itinerant teacher, which required that she travel to different schools and homes to check on the status of the students' hearing amplification, and work with teachers and students in "typical" preschools. HT 21-24 (Testimony of Kimberly Buck). Buck also worked as a teacher for thirteen years at the Pennsylvania School for the Deaf, and in an auditory oral classroom for Elwyn Early Intervention Opportunities. HT 37-38 (Testimony of Kimberly Buck). While an itinerant teacher she worked with two students with cochlear implants, and in her prior employment worked with another child with a cochlear implant. HT 25 (Testimony of Kim Buck); MCIU Ex. 19.

Other MCIU staff were available to the MCIU class, although these staff are not constantly present in the classroom. Shari McGraph, the speech and language therapist, visits the classroom twice a week for a total of six hours. Decision, at 5. She is certified in communication disorders and has a certificate of clinical competence from the American Speech Hearing Association. *Ibid.* She has provided services to five children with cochlear implants during her approximately fifteen years of experience in working with children. *Ibid.*

Terri Cohen-Johnson acts as the cochlear implant consultant for the MCIU's classroom. Decision 5, HT 667. She has worked with hearing-impaired children for over twenty-five years and obtained a certification from an intensive six-week training program (the ECTP program) on the operation of cochlear implants. Decision 5, HT 667-71. Cohen-Johnson works with staff members of the MCIU to train them on how to troubleshoot and maintain the cochlear implant devices. HT 671-73. Cohen-Johnson does not work out of the MCIU's classroom, but she is available on call for two-and-a-half days a week. HT 685-86.

Gerry Delmonico is a licensed educational audiologist. Decision 5, MCIU Ex. 18-2. He is on-call to address equipment problems and primarily works at a location about seven minutes away from the MCIU classroom. HT 312-13.

Joan Evans supervises the MCIU classroom. She received a doctorate in audiology from the University of Florida and has masters in both elementary education

and speech pathology and audiology. Decision 5-6; HT 361. She has state-certifications in education of the hearing-impaired, elementary education, and special education supervision. HT 334. She is also certified by the American Speech, Language, Hearing Association and is licensed by the Pennsylvania Department of Education in speech/language pathology and audiology. *Ibid.*

## B. Procedural History

A due process hearing was conducted on January 17 and 26, and March 12 of 2007, before the hearing officer, Daniel Myers, at the MCIU. The parties and the hearing officer took testimony from Kimberly Buck, Shari McGraph, Joan Evans, and Terri Cohen-Johnson of the MCIU. Additionally, Janice Egan, who trains teachers at Clarke, and Daniel Salvucci, the Director of Clarke, testified for the parents. Jean Moog served as an expert witness for the parents, and Marguerite Vasconcelos testified as an expert for the MCIU. Susan B. was the final witness.

Kimberly Buck testified as to her qualifications and the character of the proposed classroom. She also testified that, due to an oversight, the information given to prospective parents failed to include a complete description of the curriculum. HT 58-63. The information failed to include AUSPLAN, a curriculum specifically targeted to the hearing-impaired child. *Ibid.* The manual for AUSPLAN recommends "speech/language therapy" in one-on-one sessions. Supp. App. 27. Buck testified that the speech/language therapy given to Allyson once a week would generally be in the classroom with other

activities ongoing.  HT 88-93.  She also testified that she had some experience in troubleshooting cochlear implants and if there were further problems she could contact either Evans, Cohen-Johnson, or Delmonico for further assistance. HT 86-87.  She testified that the room had a refrigerator, but it was unplugged during the day so as not to create more noise.  HT 154-56.

Shari McGraph similarly testified to her qualifications and amount of time she spends in the classroom.  She also testified that therapy addressed at vocal quality was not age-appropriate for Allyson.  HT 194, 215-216.  Terri Cohen-Johnson, the cochlear implant consultant, testified that she had gone through troubleshooting implants with the MCIU classroom staff. HT 671-76.

Joan Evans, the supervisor of the MCIU classroom, testified to the preparation of the IEP and the development of the MCIU Auditory Oral Classroom.  She testified that she prepared the draft IEPs presented at the two IEP meetings, and that it was policy to not allow the parents to leave with a draft IEP, which were disposed of, because there will often be many changes before the final IEP.  HT 231-32.  She also testified that at the time of the IEP the state had not yet approved the MCIU classroom, but such approval was given shortly after the IEP meeting, before classes had started.  HT 237-47.  She testified that in her opinion there was little difference between hearing-aided and cochlear-implanted children in terms of classroom performance and so Allyson would not harmed by being the only cochlear implanted child.  HT 270-72.  Evans explained she

chose the MCIU classroom as a placement for Allyson because it had opportunities for inclusion with typical hearing children making it the least restrictive environment, which Clark did not; it had a cochlear implant consultant which Clarke did not; it had an educational audiologist, which Clarke did not; and it had the support of the entire MCIU's hearing support program consisting of seventeen teachers. HT 286-89. Evans also testified that, in her opinion, with the implant Allyson functioned as a child with mild hearing loss because she was meeting the benchmarks for post-implantation development created by Jean Moog. HT 368-70. During Evans' testimony, there was discussion of whether the MCIU observed Allyson at the Clarke school before the parents had signed the consent form allowing the MCIU to do so; the question, although raised, was not resolved. HT 492-96.

Daniel Salvucci, the Director of the Clarke School, observed the MCIU classroom in the fall of 2006 and testified as to several ways he found it deficient. First, he concluded that the students were older and had higher-level speech and language skills than Allyson had. Decision 7; HT 616 (Testimony of Daniel Salvucci). He also believed that Kimberly Buck, the MCIU teacher, lacked the training to balance the needs of all the students, and that Buck lacked necessary support from the MCIU. Decision, at 7; HT 617-18. He believed that the MCIU's focus on mainstreaming students was not the "best practice" as the students may lack communication skills necessary to interact with typical hearing children. Decision 7; HT 614. He was concerned with the fact that Allyson

would have been the only student with a cochlear implant, because, in his view, the MCIU classroom would not be as helpful socially for Allyson as a class with other cochlear-implanted students. HT 625. Lastly, he noted that the Clarke School, unlike the MCIU, did its "best" to eliminate plastic furniture and objects that risk creating static electricity which may interfere with cochlear implants. HT 657-58.

Janice Egan, who trains teachers for the Clarke School, also testified to her reservations about the MCIU classroom. She thought the IEP was flawed because it described Allyson as a child with mild hearing loss. HT 540-41. She also expressed concerns about the amount of speech/language therapy. HT 543-51. She thought Allyson would be unable to successfully interact with typical hearing peers. HT 565.

Jean Moog testified as an expert witness for the parents and decribed why she thought that the MCIU classroom was an inadequate placement. She is the executive director of the Moog Center for Deaf Education, which has a program for children from birth to three, a school for children from three to nine years of age, and an outreach and professional education division. HT 721-22 (Testimony of Jean Moog). She has a master's degree in speech and hearing from Washington University, and has taught courses for the Washington University Professional Education Program. HT 722-23. In addition, she has conducted several studies, developed assessments, and published numerous articles on deaf education and on education of students with cochlear implants. HT 724-33. The hearing officer described her as "nationally renowned." Decision, at 7.

Moog testified that in October of 2006 she evaluated Allyson at her center in St. Louis. HT 741-42. Moog found Allyson to have profound hearing loss, and, even though her implant gives her access to more sounds, she does not function like a child with mild hearing loss. HT 743-47, 754. Moog thought that the IEP and curriculum designed for the MCIU classroom were incorrectly addressed to children with mild hearing loss, and that they did not address what is needed for a child with a cochlear implant. HT 747-48. She thought the IEP failed to focus on development of spoken language in a way that would allow Allyson to close the gap between her and typical hearing children. HT 751-53. Moog thought Allyson needed more speech instruction than the thirty minutes of individual instruction that the IEP specified. HT 760-61, 767. She also thought that the individual instruction should not be in the classroom because of the additional noise. HT 767. Additionally, she thought the IEP goals were not sufficiently high to enable Allyson to catch up to typical hearing children. HT 762-63. She also expressed concern that interaction with typical hearing children during the school day was not a productive use of time and could be detrimental if the hearing-impaired children lacked the skills to participate. HT 784-86. In her opinion, "on paper and from testimony" it appeared to her that the MCIU classroom "fell short of completely meeting [Allyson's] needs." HT 775.

Marguerite Vasconcelos testified as an expert for the MCIU. She works for the Bucks County Intermediate Unit as an auditory verbal therapist, which differs from the auditory-oral program that the MCIU classroom and Clarke both use. HT 854, 874-885

(Testimony of Marguerite Vasconcelos). Plaintiffs' counsel objected to her testimony on this basis, but was overruled by the hearing officer because he concluded that Vasconcelos' prior experience as an itinerant auditory-oral teacher and work with hearing-impaired children qualified her as an expert in teaching the hearing-impaired. HT 885-86. However, the hearing officer noted that there "may be some argument that her testimony is not entitled to much weight." *Ibid.* Vasconcelos had never met Allyson but had observed the MCIU classroom. HT 888-891. Based on review of Allyson's testing, evaluations, and the IEP, she concluded that Allyson needed and would have been very successful in the mainstreaming opportunities that the MCIU classroom would have provided. HT 925-930. She also believed the thirty minutes of speech and language therapy to be sufficient. HT 936-37. In her opinion, the MCIU classroom and staff were appropriate. HT 937-38. Lastly, she testified that there was no concern about static discharge with more modern implants. HT 952-53.

On April 11, 2007, the hearing officer issued a decision denying the parent's requests for tuition reimbursement, transportation costs and legal fees. The hearing officer found the opinions of Salvucci, Moog, and possibly Janice Egan[3] not credible. Decision, at 8, ¶ 24. The hearing officer found that they received financial assistance from foundations that promote "non-competition" among hearing-impaired educational

---

[3] The hearing officer's decision states that he found the opinions of "private school experts" not credible without providing the names of the persons he found not credible. Decision, at 8. Therefore, it is unclear whether the hearing officer intended to include Janice Egan.

service providers. *Ibid.* Salvucci testified that he had repeatedly refused

Cohen-Johnson's application to the ECTP cochlear implant certification program because

the program was funded by a foundation which discouraged admission of professionals

who compete with other auditory oral programs. HT 655-656 (Testimony of Daniel

Salvucci). Moog's testimony involved discussion of a foundation named the Oberkotter

foundation. This foundation provides about twenty-five percent of the Moog Center for

the Deaf's funding. HT 828-30. MCIU's counsel asked at the hearing if the Oberkotter

Foundation followed a tenet of non-competition but Moog stated she did not understand

the question and there was no follow up. HT 829-30 (Testimony of Jean Moog).

The hearing officer found that the MCIU provided a Free Appropriate Public

Education (FAPE) via an appropriate Individualized Education Plan (IEP). First, the

hearing officer found that any procedural violations were not sufficient to prejudice the

student's ability to receive a FAPE and thus were immaterial. Decision, at 9-10. Next,

the hearing officer found the proposed IEP to be substantively appropriate because it was

reasonably calculated to confer meaningful education benefit. Decision, at 10-11.

The hearing officer found that in a school setting there is, in many ways, no

difference between serving a cochlear implanted student and serving a child with a

hearing aid, in that both must be functioning properly for the child to benefit from their

education. Decision, at 3. The hearing officer's finding relied upon regulations of the

Federal Department of Education that require school officials to ensure the implant is

functioning but do not require specialized maintenance and optimization such as "mapping." Final Regulations, 71 Fed. Reg. 46540, 46570 (August 14, 2006).

Even though the finding that the public placement was appropriate sufficed to support a finding that payment of tuition at Clarke was not required, the hearing officer went on to find that the private placement would have been appropriate–had the public placement been insufficient. Decision, at 11-13. He also found that the final factor, balancing of the equities, was found to be in equipoise between the two sides. *Ibid*.

Allyson's parents then brought this suit in federal court for review of the hearing officer's determination that there was no violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*, for discrimination in violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and for violations of federal law under 42 U.S.C. § 1983. In an opinion of June 12, 2008 (Docket No. 25), I dismissed the claim for money damages based on their § 1983 claim, request for money damages directly under the IDEA, and request for compensatory education under the IDEA, but allowed the claims for money damages under § 504 and for tuition reimbursement under the IDEA to proceed.

## II.    Standard of Review

It is my responsibility to undertake a modified de novo review of the hearing officer's decision. *LE v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). I make factual findings "by a preponderance of the evidence" while giving "due weight" to the

factual findings of the hearing officer. *Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d. Cir. 2004). "Due weight" means the hearing officer's factual findings are considered prima facie correct and if disregarded an explanation of the reasons for such action is required. *Id.* When "a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness," I must "accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" *Id.* (quoting *Carlisle Area School Dist. v. Scott P.*, 62 F.3d 520, 527-29 (3d Cir. 1995)). However, although "review of credibility-based factual findings is limited, it is not meaningless . . . '[when findings] are not supported by the record, and indeed, the record supports contrary findings, we must reverse.'" *Carlisle*, 62 F.3d at 528 (quoting *Ali v. Gibson*, 631 F.2d 1126, 1129 (3d Cir. 1980)).

All states receiving federal funding under the IDEA must provide a "free appropriate public education" (FAPE) to disabled students. 20 U.S.C. § 1412(a)(1). A FAPE includes:

> special education and related services that--
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). A state must provide an individualized education program (IEP) under 20 U.S.C. § 1414(d) that is "'reasonably calculated' to enable the child to receive 'meaningful education benefits' in light of the student's 'intellectual potential.'" *Shore Regional*, 381 F.3d at 198 (quoting *Polk v. Cent. Susquehanna Interm. Unit 16*, 853 F.2d 171, 181 (3d Cir. 1988)). The Third Circuit at one time referred to this standard as "more than a trivial or de minimis education benefit" but clarified that "the provision of merely more than a trivial education benefit does not meet the meaningful benefit requirement." *Ramsey*, 435 F.3d at 390 (citing *T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)) (internal quotations omitted). However, the IDEA represents only a "basic floor of opportunity." *Carlisle*, 62 F.3d at 534. Those challenging the IEP–here the student and her parents–bear the burden of proving the IEP failed to provide a meaningful educational benefit. *Ramsey*, 435 F.3d at 391 (citing *Schaffer v. Weast*, 546 U.S. 49 (2005)).

In order to obtain tuition reimbursement, the plaintiffs must show three requirements: 1) that the school district failed to offer a FAPE, 2) that the school which the parents chose is an appropriate placement, and 3) that the equities weigh in favor of reimbursement. *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 12-16 (1993). Thus if the school district offers a FAPE via an appropriate IEP, reimbursement is not appropriate.

## III.    Analysis

Susan and Mark B. on behalf of Allyson have raised several issues with regard to whether the MCIU provided Allyson a FAPE.  In addition, they raise two issues regarding the hearing officer's conduct and credibility determinations.

I must first address the issues that arose during the administrative hearing regarding impartiality and credibility determinations as they may have an impact on my decision on the merits.  First, plaintiffs argue that the hearing officer was not impartial because he 1) worked with Karl Romberger, counsel for the MCIU, when Romberger was a hearing officer, and 2) currently works with Romberger's wife who is also an education hearing officer.  Pls'.  Resp. To Def's. Mot. for Summ. J./J. on the Administrative R. 14-18.  Plaintiffs further argue that the hearing officer failed to disclose this fact in violation of Pennsylvania's Special Education Dispute Resolution Manual, Pennsylvania Code of Judicial Conduct, and Pennsylvania Canons of Ethics for attorneys.  *Ibid*. Relatedly, plaintiffs challenge the hearing officer's credibility determination regarding their experts particularly Jean Moog.  *Ibid.*

### A.    Alleged Bias of Hearing Officer

Defendant does not deny that defense counsel was, and his wife is, a hearing officer.  Def's. Br. in Opp'n. To Pls' Cross Mot. for Summ. J. and J. on the Administrative R. 4.  The MCIU does, however, dispute the characterization that defense counsel and his wife worked with the hearing officer at a "state entity" and instead claim

that the hearing officers are independent contractors assigned on a case-by-case basis.

*Ibid.* The MCIU further argues that the Special Education Dispute Manual has no force of law, and, even if it did, the Manual does not require recusal simply because of a prior relationship. Def's. Br. in Opp'n. To Pls' Cross Mot. for Summ. J. and J. on the Administrative R. 4-5.

The axiom that "[t]rial before 'an unbiased judge' is essential to due process" applies in the administrative hearing context as well. *Hummel v. Heckler*, 736 F.2d 91, 93 (3d Cir. 1984). Here, the professional connection between Romberger and the hearing officer did not cause the hearing officer to be biased or risk the appearance of impropriety. The parents concede that the Special Education Dispute Resolution Manual has no force of law. Br. in Supp. of Pls' Reply. 3; see also *Bethlehem Area Sch. Dist. v. Zhou*, 976 A.2d 1284, 1287-89 (Pa. Commw. Ct. 2009) (finding that the Manual has no force of law because it is not a properly promulgated administrative regulation). Plaintiffs thus appear to rest their argument on due process grounds, as it is not argued in plaintiffs' briefing how the Pennsylvania Code of Judicial Conduct and Pennsylvania Canons of Ethics were violated.

Due process does not require a judicial officer to recuse simply because the officer had at one time a working relationship with the counsel of a party. Cf. *Dembowski v. New Jersey Transit Rail Operations, Inc.*, 221 F. Supp. 2d 504, 510-12 (D.N.J. 2002) (finding it permissible for part-time magistrate judge to appear as a lawyer in the district

where he works). Thus, I reject the contention that the hearing officer needed to disclose 1) his past working relationship with defense counsel and 2) his present colleagueship with defense counsel's wife.

### B. Credibility of the Plaintiffs' Witnesses

With regard to the credibility determinations, I find the hearing officer's explanation of his credibility determination with regard to Jean Moog and Janice Egan insufficient even under the deferential standard applied to the credibility determinations of a hearing officer. First, the hearing officer's opinion could be read to discredit the testimony of Janice Egan because she is one of the "Private School and Moog Center professionals" who testified. I decline to read the opinion as discrediting her testimony given that there is no evidence submitted that she was aware that the Clarke School followed non-competition principles or took money from foundations that did (if it in fact did, as the record lacks any evidence of such).

Second, I am bound to respect the credibility determination regarding Salvucci's testimony. He admitted to applying non-competition principles in his role with the ECTP cochlear implant certification program that hindered MCIU staff's ability to obtain admission. HT 655-656. The hearing officer's determination that Salvucci's testimony was not credible is supported by facts in the record and not contradicted by "extrinsic evidence in the record [which] would justify a contrary conclusion."

The credibility determination with regard to Jean Moog presents a difficult

question because the record does not contain evidence that supports the facts on which the hearing officer's credibility determination is based. No evidence was introduced that the Oberkotter Foundation followed non-competition principles. Additionally, there is no evidence that the Oberkotter Foundation was the same foundation that funded the ECTP program. There was only a suggestive question asked of Moog, which she did not understand. Thus, apart from defense counsel's pointed question, nothing in the record suggests that Moog has personally or professionally received benefits from a foundation that espouses non-competition principles. I am bound to give due weight to the factual findings of the hearing officer, but my review is modified *de novo*, and because there is no evidence suggesting that Moog took money from a non-competition foundation, I reject the hearing officer's factual finding that Moog did. Because the hearing officer's credibility determination was based on a factual determination that lacks support I am disregarding his credibility determination that is dependent on an erroneous factual finding. I will consider Jean Moog's testimony.

### C. Alleged Procedural Vioaltions

The parents of Allyson B. raise several issues with the IEP and proposed placement at the MCIU. These issues are of two kinds–alleged procedural violations and alleged substantive deficiencies. The procedural violations alleged are 1) that the parents failed to receive notice of the June 13, 2006 IEP meeting, 2) the MCIU failed to include AUSPLAN in the description of the curriculum, and 3) the MCIU may have observed

Allyson without her parents' consent.

The standards for finding that a procedural violation created an error in a student's IEP are quite high. A plaintiff must show that the procedural violation "impeded the child's right to a [FAPE]," such that it "significantly impeded the parents' opportunity to participate in the decisionmaking process," or it "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E); *C.M. v. Board of Educ. of the Union County Reg'l High Sch. Dist.*, 128 Fed. Appx. 876, 881 (3d Cir. 2005). Plaintiffs have not met this burden. It is unclear from the record when the parents did receive notice of the IEP and whether Allyson was observed without permission. With regard to the lack of notice, it does not appear to have significantly impeded the parents' opportunity to participate in the decision-making process: Susan B. and a Clarke employee, Jeana Novak, were still able to attend the second IEP. The parents had already given input during the first IEP which resulted in an additional thirty minutes of speech and language therapy a week. The failure to include AUSPLAN in the description of the curriculum also did not interfere with the parents' participation rights, prevent an offer of a FAPE, or cause a deprivation of educational benefits. The plaintiffs have not shown that the failure to mention the AUSPLAN curricula kept them from adequately evaluating the placement, when several other curricula and a description of the daily activity of the classroom were given to them, and there is no requirement that the IEP include the curriculum. Thus, the procedural deficiencies were not sufficient to require finding the IEP insufficient.

**D.     Alleged Substantive Problems of the IEP**

Allyson's parents' have raised several factors that in their view render the IEP offered by the MCIU insufficient to constitute an offer of a FAPE.  They assert that the offer was inadequate because 1) it failed to recognize the differences between a child with a cochlear implant and a child with a hearing aid, 2) inclusion with typical-hearing children would not be the best use of Allyson's time at school and could be detrimental, 3) the MCIU teachers were not qualified to teach a student with a cochlear implant, 4) Allyson was the only student with a cochlear implant, 5) there was no program in place at the time of the IEP for the parents to evaluate, 6) the IEP was based on the understanding that Allyson acted as child with mild hearing loss when the implant was functioning, and 7) the thirty minutes of speech/language therapy was inadequate to meet Allyson's needs.

**1.     Difference Between Hearing-Aided Child and**

**Cochlear-Implanted Child**

The parents argue the MCIU failed to appreciate the difference between teaching a child with a cochlear implant and a child with a hearing aid.  Because of the development of Department of Education regulations in the is area, I must divide this argument into two parts–issues regarding the ability of the MCIU to troubleshoot and perform maintenance on the device, and issues regarding substantive educational concerns.  First, the parents argue the maintenance and testing of the implant differs from a hearing aid. The Federal Department of Education has interpreted the IDEA to require no more

technical assistance from educators for children with cochlear implants than the IDEA requires from educators for hearing-aided children. See Final Regulations, 71 Fed. Reg. 46540, 46570 (August 14, 2006) ("In many ways, there is no substantive difference between serving a child with a cochlear implant in a school setting and serving a child with a hearing aid."). However, because the regulation was intended to clarify "that related services do not include a medical device that is surgically implanted, the optimization of that device's functioning (e.g., mapping), maintenance of that device, or the replacement of that device," *id*. at 46541, the regulation does not foreclose the argument that there are some differences between educating a child with a cochlear implant and educating a child with a hearing aid, beyond the technical aspects of the device.

While leaving open the possibility that there are educational differences between hearing-aided and implanted students, the plaintiffs have failed to tie these difference to the substantive legal standard. The testimony presented by the plaintiffs at the hearing only establishes that Clarke may provide educational benefits that the MCIU classroom does not. This does not amount to a lack of meaningful educational benefits. Even crediting Moog's testimony, which the hearing officer did not do, she only established that the MCIU "fell short of completely meeting [Allyson's] needs." HT 775. The IEP may fall short of completely meeting Allyson's needs, but it does appear reasonably calculated to give her meaningful education benefits.

The MCIU classroom has the means of performing routine checks of her equipment, and also has amplification devices in the classroom. It has been tested for background noise and meets educational standards. The MCIU staff has experience with cochlear implants. The IEP calls for daily activities involving integrated speech and language activities. Thus, the IEP and placement appear to be reasonably calculated to give Allyson meaningful education benefits.

### 2.    Inclusion with Typical Children

The plaintiffs argued that inclusion with typical children would not be beneficial to Allyson and might in fact be detrimental. Their expert Jean Moog testified as such. First, the MCIU must comply with a legal requirement to provide the least restrictive environment. Mainstreaming is a strong, if not principal, policy goal of the IDEA. *Ramsey*, 435 F.3d at 390-91. The MCIU must "to the greatest extent possible" provide Allyson with an education together with children who are not disabled. *Id.* at 391. The IEP attempts to comply with this by noting Allyson will "participate with typically-developing children in appropriate preschool activities." Parents' Ex. 18. The MCIU placed Allyson in a classroom where she would have the opportunity to participate with typical children. The plaintiffs have not established that the MCIU staff is incapable of doing so in a way that would be able to provide Allyson meaningful educational benefits. The IEP does not call for placement with typical children in a way that would be detrimental to Allyson. It limits it to "appropriate" activities. The success of any IEP

will depend on how it is implemented by school staff, but that alone is not a reason for rejection of the IEP at the outset.

### 3.    Qualifications

The parents' argument that the MCIU teachers are unqualified does not establish that Allyson would not receive meaningful education benefits.  First, the Third Circuit has rejected an argument that an IEP, which fails to name the service providers, thus preventing evaluation of their qualifications, was inadequate..  See *Ramsey*, 435 F.3d at 395.  Here all staff of the MCIU have extensive experience in deaf education, graduate degrees in deaf education or similar areas, and are state-certified.  It was certainly reasonable for the parents to feel that they trusted Clarke's staff and Clarke's methods of hiring and training teachers.  However, that does not mean that the certified, experienced, and educated staff members of the MCIU are unable to provide Allyson meaningful education benefits.

### 4.    Lack of Other Students with Cochlear Implants

The plaintiffs argue that the fact that Allyson would have been the only student with a cochlear implant rendered the placement inappropriate.  While this is certainly a valid concern for Allyson's social development, it does not render the IEP and placement defective.  The standard the plaintiffs must meet is that the IEP does not provide meaningful educational benefits.  The plaintiffs have not shown how the lack of other

children with cochlear implants prevents Allyson from receiving educational benefits.[4]

### 5.     Lack of an Existing Programs

The plaintiffs also take issue with the fact that there was no program for them to observe and evaluate.  The IDEA does not require that the program be in place before the student attends, only that the MCIU develop a plan calculated to give meaningful educational benefits.  The requirements of the IDEA for IEPs contained in 20 U.S.C. § 1414(d) are entirely prospective.  The substantive standard, itself, is that the IEP be "reasonably calculated," which goes to the prospective nature of the IEP.  Like any IEP or placement, there must be an opportunity to implement the plan.

### 6.     Evaluation of Allyson as a Child with Mild Hearing Loss

The plaintiffs and their expert, Jean Moog, took issue with the description of Allyson as a child with mild hearing loss when her cochlear implant is functioning.  However, Moog's focus was again on providing Allyson with the best possible education and not simply whether the IEP would provide meaningful education benefits.  Moog testified that it is incorrect to describe Allyson as a child with mild hearing loss because "although children with implants do learn in the environment around them, they need to have their language accelerated faster than that in order to close the gap."  HT 755:17-21.  Again, the plaintiffs have challenged the adequacy of the MCIU to maximize Allyson's

---

[4] This does not mean social concerns are necessarily irrelevant to whether a child will receive meaningful educational benefits but merely that in this case the plaintiffs have failed to support the connection.

potential but they do not establish that the speech and language activities conducted by qualified MCIU staff would not provide meaningful education benefits to Allyson.

### 7. Adequacy of Thirty Minutes of Speech and Language Therapy

Allyson's parents argue that Allyson requires 30 minutes of daily pull-out speech and language therapy. The IEP only required that she receive 30 minutes of such therapy per week, which was to be done in the classroom and not a separate room. Department of Education regulations make clear that school districts are still required to provide related services such as speech and language therapy, even though they are not required to provide optimization of the assistive technology itself. 71 Fed. Reg. 46570. However, the record contains extensive testimony to establish that the 30 minutes of speech therapy, in the context of other speech-related activities throughout the day, would provide meaningful educational benefit. The MCIU program incorporated at least two days of integrated speech a week. HT at 304 (Testimony of Joan Evans). The MCIU teacher stated: "Language happens throughout the day, all day long. It's five hours of speech/language services throughout the day." HT at 78:1-3 (Testimony of Kimberly Buck). Shari McGrath testified that three to six hours of speech therapy would be an exceptionally high amount and she has never given that much individualized therapy to any child. HT at 221. Thus, the amount of therapy given would appear to have a benefit for Allyson.

The testimony of plaintiffs' witnesses does not establish that receiving only 30

minutes of therapy each week would prevent Allyson from receiving meaningful educational benefits. Rather, their testimony is to the effect that more than 30 minutes would enhance Allyson's potential. *See, e.g.*, HT 552:20-21 (Testimony of Janice Egan) ("I think therapy one time a week would not help her maximize her language."). I, of course, understand Allyson's parents' wish to have Allyson receive the most preferred therapy. But, a FAPE does not require educational authorities to provide the very best possible education benefits. A FAPE calls for meaningful education benefits. The record establishes that the MCIU program would meet this standard.

### E.     Section 504 Claim

In order to establish a violation of § 504 of the Rehabilitation Act,[5] "a plaintiff must prove that (1) [s]he is 'disabled' as defined by the Act; (2) [s]he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) [s]he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Ridgewood Bd. of Educ. v. N.E. ex. rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999) (citing *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995)). The Third Circuit "held that there are few differences, if

---

[5] Section 504 states:
No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
29 U.S.C. § 794.

any, between IDEA's affirmative duty and § 504's negative prohibition and have noted that the regulations implementing § 504 require that school districts 'provide a free appropriate education to each qualified handicapped person in [its] jurisdiction.'" *Ridgewood*, 172 F.3d at 253 (quoting *Matula*, 67 F.3d at 292-93). However, the Third Circuit recently clarified that while the same conduct may be the basis for both an IDEA and a § 504 claim, the plaintiffs "must still prove that there was a violation of [§504]" even if a violation of the IDEA is found. *Andrew M. v. Delaware County Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007).

The plaintiffs here are in an even more tenuous position than the plaintiffs in *Andrew M*. The district court there found that the school district violated the IDEA, and therefore this was to be regarded as a *per se* violation of § 504. *Id.* The Third Circuit, however, disagreed, and held that an IDEA violation does not *per se* fulfill the elements of a § 504 claim. *Id.* In many instances there will be overlap, since a disabled child who does not receive a FAPE in all likelihood did not receive it due to the child's disability, while non-disabled children would receive a FAPE. The difference between the IDEA and § 504 arises as in *Andrew M*. and as here, where non-disabled children are not entitled to a FAPE as Pennsylvania does not provide public education to similarly situated non-disabled children. Plaintiffs cannot show discrimination due to the child's disability from the failure to provide the child a FAPE, as only children with disabilities, and not typical children, are entitled to a FAPE. *Id.* at 350.

The MCIU's actions did not violate § 504. First, the MCIU did not violate § 504 because there is no evidence in the administrative record that Allyson was "excluded from participation in, denied the benefits of, or subject to discrimination at, the school." Plaintiffs cannot satisfy this fourth requirement of a § 504 claim because "[t]he state must have failed to provide the service for the sole reason that the child is disabled." *Andrew M.*, 490 F.3d at 350. Allyson's parents and not the MCIU removed her from the MCIU's classroom. The MCIU refused to pay for Allyson's placement at Clarke due to her not having been previously at Clarke in an MCIU placement, not because of her disability. Decision, at 6-7. Since the children placed at Clarke had disabilities similar to, or the same as, Allyson's disability, she was not treated differently based on her disability, but rather because the MCIU happened to be opening its own classroom for the hearing impaired at the same time Allyson was entering preschool. Second, as discussed above the MCIU did provide Allyson a FAPE, and, thus, there was not a violation of the IDEA that would potentially support a § 504 claim. Section 504 was not violated.

## III. Conclusion

For the reasons stated above, I conclude that, based on the administrative record and supplementary materials, the defendant is entitled to judgment on the administrative record. The defendant's motion for summary judgment/judgment on the administrative record is granted, while the plaintiffs' amended motion for summary judgment/judgment on the administrative record is denied. An appropriate order follows.